Angelia JAMERSON, Petitioner-Appellant,†

v.

DEPARTMENT OF CHILDREN & FAMILIES and
Wisconsin Department of Administration,
Division of Hearings and Appeals,
Defendants-Respondents.

Court of Appeals

*No. 2011AP593. Submitted on briefs December 6, 2011.
—Decided February 7, 2012.*

2012 WI App 32

(Also reported in 813 N.W.2d 221.)

† Petition for Review granted 6/13/12.

215

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Jill M. Kastner* and *Sheila Sullivan* of *Legal Action of Wisconsin, Inc.*, of Milwaukee.

On behalf of the defendants-respondents, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *Nadim Sahar*, assistant attorney general.

Before Curley, P.J., Kessler and Brennan, JJ.

¶ 1. CURLEY, P.J.   Angelia Jamerson appeals the decision of the Department of Children and Families

217

("the Department"), which dismissed her appeal regarding the revocation of her group childcare license without a hearing on the basis that there were no issues of fact and judgment was warranted as a matter of law. She also appeals the trial court's order affirming the Department's decision. The Department determined that under Wisconsin's new caregiver law, 2009 Wis. Act 76 and Wis. STAT. § 48.685(5)(br)5. (2009–10),[1] Jamerson was permanently prohibited from obtaining a license because she had been, nearly two decades earlier, convicted of offenses relating to food stamps and public assistance, contrary to Wis. STAT. § 49.127(2m) and 49.12(1) & (6) (1989–90), respectively. We agree with Jamerson that she was entitled to a hearing because the fact that she was convicted under these statutes does not, without further factual development, place her under § 48.685(5)(br)5.'s permanent bar. Therefore, we reverse the Department's decision and the trial court's subsequent order, and remand the matter to the Division of Hearings and Appeals ("the Division") for a hearing.

## I. BACKGROUND.

¶ 2.    On December 11, 2009, the Department notified Jamerson, owner of Children's Fantasy Child Care & Preschool,[2] that her group childcare license would be summarily suspended as of 12:00 a.m. the next day. The Department summarily suspended her license because four months earlier, on August 6, 2009, Brenda Ashford, a Children's Fantasy employee, had,

---

[1] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

[2] The record refers to Jamerson's daycare center as both "Children's Fantasy" and "Childrens Fantasy." We will refer to the center "Children's Fantasy."

218

according to a criminal complaint, sold approximately $320.00 worth of marijuana to an undercover police officer as part of a controlled buy; and the buy had taken place during business hours "on the corner just west" of Children's Fantasy.

¶ 3. Jamerson reacted to the news immediately. That very same day, she faxed a letter to the Department notifying it that she had terminated Ashford and that Ashford would remain terminated regardless of the results of the pending charges.[3] Three days later, on December 14, 2009, Jamerson submitted an affidavit explaining that: she had no knowledge of the charges against Ashford until the Department had contacted her about them in December; she had not only terminated Ashford, but also had prohibited Ashford from coming near the vicinity of Children's Fantasy; and she had met with her staff regarding the incident.

¶ 4. Nevertheless, the Department formally revoked Jamerson's childcare license on January 20, 2010. While the Department's summary suspension notice had listed only one ground, the notice of revocation provided two bases for the Department's action: (1) Ashford's aforementioned marijuana charges, to which she had by this point pled guilty; and (2) the Department's interpretation of the new child caregiver law, specifically, WIS. STAT. §§ 48.685(4m)(a)1. & 48.685(5)(br)5., which would become effective February 1, 2010. Regarding the new caregiver law, the Department alleged it could not continue to allow Jamerson to hold her license because she had, more than two decades earlier, been convicted of offenses relating to food stamps and public assistance, contrary to WIS. STAT. § 49.127(2m) and 49.12(1) & (6)

---

[3] At this point in time, Ashford had been charged, but had not yet entered a plea.

(1989–90), which permanently prohibited her from holding a license under the new law.

¶ 5. Jamerson, who had been forthcoming about her 1991 offenses, appealed the Department's revocation, and her case was assigned to an administrative law judge ("ALJ") at the Division of Hearings and Appeals, who scheduled a hearing on the matter for June 8, 2010.[4]

¶ 6. A few weeks before the hearing was scheduled to take place, the Department filed a motion to dismiss Jamerson's appeal. The Department argued that under the new caregiver law, Jamerson's prior convictions under Wis. Stat. § 49.12(1) & (6) (1989–90), which the Department claimed derived from "fraudulent food stamps," resulted in an "automatic bar" preventing her from ever obtaining or holding a group childcare license. Neither the Department's motion nor the attached exhibits indicated whether Jamerson's convictions under § 49.12(1) & (6) actually stemmed from an incident involving food stamps, or whether they instead derived from an incident separate from the Wis. Stat. § 42.127(2m) (1989–90) food stamp violation.[5] Jamerson opposed the motion.

¶ 7. The ALJ granted the Department's motion, determining that Jamerson's 1991 convictions under Wis. Stat. § 49.12(1) & (6) (1989–90):

---

[4] During the pendency of her revocation appeal, Jamerson also appealed the Department's decision to suspend her license during revocation proceedings. Jamerson's appeal of that particular decision is not at issue here.

[5] The judgment of conviction for these offenses indicates that Jamerson violated Wis. Stat. § 49.12(1) & (6) (1989–90) between November 3, 1988 and February 28, 1991, and that she violated Wis. Stat. § 49.127(2m) (1989–90) between January 1, 1989 and February 28, 1990.

did as a matter of law constitute fraudulent activity by [Jamerson] as a Food Stamp recipient and participant, and was exactly the type of historical criminal background that the Legislature intended to bar from holding, or continuing to hold, a child care license of any kind when it enacted WIS. STAT. § 48.685(5)(br)5. This conclusion renders a hearing on the revocation . . . moot as a matter of fact and law. [Jamerson] is prohibited from holding a group childcare license because of this past conviction.

¶ 8.  The Department adopted the ALJ's decision as its final order on the matter. Jamerson consequently appealed to the trial court, who affirmed the Department's decision. Jamerson now appeals.

## II. ANALYSIS.

*Standard of Review.*

¶ 9.  On appeal, Jamerson challenges the Department's decision that she was not entitled to a hearing regarding the revocation of her group childcare license as well as the trial court's order affirming the Department's decision. We review the Department's legal conclusions, not those of the trial court. *See Emmpak Foods, Inc. v. LIRC*, 2007 WI App 164, ¶ 3, 303 Wis. 2d 771, 737 N.W.2d 60.

¶ 10.  "We generally apply three levels of deference to conclusions of law and statutory interpretation in agency decisions." *Kitten v. DWD*, 2001 WI App 218, ¶ 22, 247 Wis. 2d 661, 634 N.W.2d 583, *aff'd,* 2002 WI 54, 252 Wis. 2d 561, 644 N.W.2d 649. "These three levels take into account the comparative institutional qualifications and capabilities of the court and the administrative agency." *MercyCare Ins. Co. v. Wisconsin*

221

*Comm'r of Ins.*, 2010 WI 87, ¶ 28, 328 Wis. 2d 110, 786 N.W.2d 785. The first level of deference, "great weight" deference, applies when: (1) the legislature charged the agency with the duty of administering the statute; (2) the agency's statutory interpretation is one of long-standing; (3) "the agency employed its specialized knowledge or expertise in forming the interpretation;" and (4) "the agency's interpretation will provide consistency and uniformity in the application of the statute." *Tannler v. DHSS*, 211 Wis. 2d 179, 184, 564 N.W.2d 735 (1997). The second level of deference, "due weight," applies when "the agency has some experience in an area but has not developed the expertise that places it in a better position than the court to make judgments regarding the interpretation of the statute." *MercyCare*, 328 Wis. 2d 110, ¶ 30. When due weight deference applies, we sustain an agency's interpretation "if it is not contrary to the clear meaning of the statute" or unless we determine "that a more reasonable interpretation exists." *See id.* The third and lowest level of deference, *de novo* review, applies "where it is clear from the lack of agency precedent that the case is one of first impression for the agency and the agency lacks special expertise or experience in determining the question presented." *Kitten*, 247 Wis. 2d 661, ¶ 22.

¶ 11. We conclude that *de novo* review applies in Jamerson's case. While the Department has correctly argued that certain factors supporting "great weight" or even "due weight" deference are present—including the fact that the Department was charged with administering the new caregiver law and that applying its interpretation will provide uniformity and consistency in the law's application, *see, e.g.*, *Tannler*, 211 Wis. 2d at 184, the issue before us—whether Jamerson's convictions

under Wis. Stat. § 49.12(1) & (6) (1989–90) permanently bar her from possessing a group childcare license under Wis. Stat. §§ 48.685(5)(br)5.—is one of first impression, and therefore the Department lacks expertise "in determining the question presented," *see Kitten*, 247 Wis. 2d 661, ¶ 22. Consequently, we review the Department's decision independently. *See id.*

*Wisconsin's new caregiver law.*

¶ 12. Jamerson's case requires us to determine whether the Department properly dismissed her appeal as a matter of law pursuant to Wisconsin's new caregiver law, 2009 Wis. Act 76. State law requires individuals who run a childcare business or operate an in-home daycare of a certain size to obtain caregiver certification or licensing. Wis. Stat. §§ 48.65, 48.651(1)-(2). State law also requires that a criminal history and child abuse record search take place to determine whether an applicant for certification or licensure or an employee thereof has been found guilty of child abuse or neglect, or another serious crime related to caring for children. Wis. Stat. § 48.685. The Department is the agency responsible for licensing childcare providers who care for four or more persons under the age of seven for less than twenty-four hours a day. Wis. Stat. § 48.651(1).

¶ 13. Prior to the passage of the new caregiver law, there existed a permanent but rebuttable presumption of disqualification from licensure for individuals convicted of serious violent crimes and crimes against children. *See, e.g.,* Wis. Stat. § 48.685(4m), (5) (2007–08). Under the old law, if the background check revealed a conviction or pending charge for child abuse or a serious enumerated offense, no license or certifica-

223

tion would be issued unless and until the individual proved that he or she had been rehabilitated and no longer posed a threat to children. *See id.*

¶ 14. The new caregiver law revised WIS. STAT. § 48.685 by, among other things, adding a lengthy list of additional offenses for which an individual's license could be revoked and by creating two new forms of disqualification—one lasting five years and the other lasting for life. *See* 2009 Wis. Act 76, § 24. Individuals subject to the five-year bar are disqualified from licensure or certification for five years after the date that the offender completes probation or parole. *See id.* After five years, however, the disqualification disappears, and the offender is treated like any other applicant for a caregiver license. *See id.* Individuals subject to the new lifetime ban have no access to a hearing to prove rehabilitation. *Id.*

¶ 15. Crimes subject to the five-year bar include: felony offenses under the Uniform Controlled Substances Act under WIS. STAT. ch. 961; substantial or aggravated battery (WIS. STAT. § 940.19(2), (4), (5) , or (6)); and homicide by intoxicated use of vehicle or firearm (WIS. STAT. § 940.09), among others. *See* 2009 Wis. Act 76, § 24.

¶ 16. Crimes subject to the permanent bar include: theft of satellite cable programming (WIS. STAT. § 943.47(2)); theft of video service (WIS. STAT. § 943.46(2)); forgery (WIS. STAT. § 943.38(1)-(2)); theft of telecommunications services (WIS. STAT. § 943.45(1)); theft of commercial mobile service (WIS. STAT. § 943.455(2)); and felony retail theft (WIS. STAT. § 943.50(1m)), among others. *See* 2009 Wis. Act 76, § 24; *see also* WIS. STAT. § 48.685(5)(br)3m.

¶ 17. Also subject to the permanent bar are offenses involving "fraudulent activity" in various realms,

including: (1) as a participant in the Wisconsin Works program under Wis. Stat. §§ 49.141 to 49.161, including as a recipient of a child care subsidy under § 49.155, or as a recipient of aid to families with dependent children under § 49.19, medical assistance under subch. IV of Wis. Stat. ch. 49; (2) food stamps benefits under the food stamp program under 7 USC §§ 2011 to 2036; (3) supplemental security income payments under Wis. Stat. § 49.77; (4) payments for the support of children of supplemental security income recipients under Wis. Stat. § 49.775; and (5) health care benefits under the Badger Care health care program under Wis. Stat. § 49.665. *See* 2009 Wis. Act 76 § 24; *see also* Wis. Stat. § 48.685(5)(br)5.[6]

*Jamerson is entitled to an administrative hearing regarding whether she was permanently barred from holding a group childcare license under the new car-*

---

[6] Wisconsin Stat. § 48.685(5)(br)5. provides, in pertinent part:

For purposes of licensing a person to operate a day [child] care center ... no person who has been convicted or adjudicated delinquent on or after his or her 12th birthday for committing any of the following offenses ... may be permitted to demonstrate that he or she has been rehabilitated:

. . . .

[a]n offense involving fraudulent activity as a participant in the Wisconsin Works program under ss. 49.141 to 49.161, including as a recipient of a child care subsidy under s. 49.155, or as a recipient of aid to families with dependent children under s. 49.19, medical assistance under subch. IV of ch. 49, food stamps benefits under the food stamp program under 7 USC 2011 to 2036, supplemental security income payments under s. 49.77, payments for the support of children of supplemental security income recipients under s. 49.775, or health care benefits under the Badger Care health care program under s. 49.665.

(First set of brackets in Wis. Stat. § 48.685(5)(br)5.)

*egiver law because, even given her 1991 convictions under WIS. STAT. §§ 49.12(1), 49.12(6) and 49.127(2m) (1989–90), there were issues of fact regarding the circumstances underlying the convictions.*

¶ 18.  We now turn to Jamerson's 1991 convictions to determine whether, under WIS. STAT. § 48.685(5)(br)5. —which, as noted, now permanently bars individuals convicted of "fraudulent activity" involving food stamps from obtaining licenses—they prohibit her from holding a group child care license as a matter of law. It is undisputed that Jamerson was convicted in 1991 of offenses under two separate statutes:  violations of WIS. STAT. § 49.127(2m) (1989–90) and WIS. STAT. § 49.12(1) & (6) (1989–90). As noted, however, the record does not provide any facts regarding the specific actions underlying these convictions. We do not know whether the convictions stem from a single bout of ongoing behavior or from separate actions, though the fact that the judgment of conviction provides different dates on which the two differing statutes were violated strongly persuades us that the convictions derived from different actions.[7] Finally, we note that although the decision adopted by the Department addresses only Jamerson's conviction under WIS. STAT. § 49.12(1) & (6), we begin our *de novo* analysis by addressing the conviction under § 49.127(2m) (1989–90). *See Kitten*, 247 Wis. 2d 661, ¶ 22.

¶ 19.  WISCONSIN STAT. § 49.127 (1989–90) is titled, "Food stamp offenses," and subsection (2m), under which Jamerson was convicted in 1991, provides:  "[n]o person may knowingly fail to report changes in income, assets or other facts as required under 7 USC 2015(c)(1) or regulations issued under that provision."

---

[7] *See, supra,* note 4.

¶ 20. Given the statutory language and its context, *see State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶¶ 45–46, 271 Wis. 2d 633, 681 N.W.2d 110, we conclude that a conviction under WIS. STAT. § 49.127(2m) (1989–90) does not, as a matter of law, show that an offender has partaken in a "fraudulent activity" regarding food stamps for purposes of permanent prohibition under WIS. STAT. § 48.685(5)(br)5. First, nowhere does this subsection mention fraud. Indeed, the offense defined by § 49.127(2m) does not include an element intrinsic to fraud: the intent to induce another party to act to its detriment. *See* BLACK'S LAW DICTIONARY 685 (8th ed. 2004) (defining "fraud" as "[a] knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment"); *see also Derbeck v. Albright*, 186 Wis. 515, 203 N.W. 337, 339 (1925) (Crownhart, J., dissenting ) (defining fraud as " '[a] generic term" that "embraces all the multifarious means which human ingenuity can devise, and are resorted to by one individual to get an advantage over another by false suggestions, or by the suppression of the truth.' ") (citation omitted). Furthermore, we note that § 49.127(2m) references a recipient's requirements under 7 USC § 2015(c)(1), and that, notably, that section of the United States Code does not discuss fraud. *See* 7 USC § 2015(c)(1).[8] On the other hand, a different section of the code, 7 USC § 2015(b),

---

[8] 7 USC § 2015(c) is titled "Refusal to provide necessary information" and provides, in pertinent part:

[e]xcept in a case in which a household is receiving transitional benefits during the transitional benefits period under section 2020(s) of this title, no household shall be eligible to participate in the supplemental nutrition assistance program if it refuses to cooperate in providing information to the State agency that is

*does* discuss fraud, and defines it as a two-prong offense involving: (1) the making of a "false or misleading statement," with (2) the intent to use, present, transfer, acquire, receive, or possess program benefits. *See id.* Because the second prong is not required for a violation under § 49.127(2m), we conclude that further factual inquiry is required to determine whether Jamerson's failure to report "changes in income, assets, or other facts" as required by the federal food stamp law was in fact done with the intent to induce another to act to his or her detriment. *See, e.g.,* BLACK'S LAW DICTIONARY 685 (8th ed. 2004). In other words, there is an issue of fact here entitling Jamerson to a hearing. *See* WIS. STAT. § 227.42(1).

¶ 21. WISCONSIN STAT. § 49.12 (1989–90) is titled "Penalties; evidence," and the sections under which Jamerson was convicted in 1991 provide, in pertinent part:

(1) [a]ny person who, with intent to secure public assistance under this chapter . . . willfully makes any false representations may . . . be punished as prescribed under [WIS. STAT. §] 943.20(3)(c).

. . . .

(6) [w]here a person is originally eligible for assistance and receives any income or assets or both thereafter and fails to notify the officer or agency granting such assistance of the receipt of such assets within 10 days after such receipt and continues to receive aid, such failure to so notify the proper officer or agency . . . shall be considered a fraud."

¶ 22. While WIS. STAT. § 49.12(6) (1989–90) does in fact state that an offense involving the failure to notify

necessary for making a determination of its eligibility or for completing any subsequent review of its eligibility.

the proper agency about received assets or income "shall be considered a fraud," we cannot conclude, without further factual inquiry, that Jamerson's conviction under this statute permanently bars her from obtaining a license pursuant to Wis. Stat. § 48.685(5)(br)5. This is so, first, because no offense under Wis. Stat. § 49.12 (1989–90) is included in the list of offenses enumerated in § 48.685(5)(br)5. Second, we cannot conclude, as the ALJ determined and as Respondents would have us conclude—that Jamerson's "fraud" under § 49.12(1) & (6), does in fact refer to a food stamp offense because there is no evidence in the record supporting that conclusion. There is also no evidence in the record that the same course of behavior formed the basis for Jamerson's violations of § 49.12 and Wis. Stat. § 49.127(2m) (1989–90). As noted, the judgment of conviction strongly suggests otherwise. Moreover, the kind of violations described in § 49.12(1) & (6) have an essential element of fraud that § 49.127(2m) does not: § 49.12(1) requires "willfully" made "false representations" "with intent to secure public assistance" and § 49.12(6) requires the failure to notify an officer or agency of the receipt of assets *while continuing to receive public assistance. See* § 49.12(1) & (6) (emphasis added). A § 49.127(2m) violation, on the other hand, involves only the knowing failure to report income or asset changes. We are unwilling to conclude that an individual who knowingly fails to perform a statutorily prescribed duty, without intent to deceive or without wrongfully receiving a benefit, has committed fraud.

¶ 23.    This is not to say that the facts underlying a food stamp violation under Wis. Stat. § 49.127(2m) (1989–90) could never constitute fraud relating to public assistance as defined by Wis. Stat. § 49.12(1) & (6) (1989–90). While it does appear that a food stamp

229

offense under § 49.127(2m) *could* be the kind of failure to notify constituting fraud under § 49.12(6), we do not know, without further factual inquiry, whether this is true in Jamerson's case. This is because there are no facts indicating whether the convictions for violations stem from one action—a single "fraud" that involved food stamps—or whether instead the convictions derived from two separate actions:  one that the State pursued with a charge under § 49.12(1) and (6) and one pursued with a charge under § 49.127(2m). Given that the offenses occurred during different times, it is quite possible that the latter scenario is in fact what occurred here.

¶ 24.   However, in this case the record is void of such information because the matter was determined on the basis of Jamerson's convictions alone—and determined without a hearing. Indeed, the fact that Jamerson's convictions formed the *entire* basis of the Department's decision was, in this case, troubling—especially given the harsh penalty demanded by the new caregiver law.

¶ 25.   For these reasons, we must reverse the trial court's order, and must reverse the Department's determination that Jamerson's convictions, as a matter of law, permanently prohibited her from holding a group childcare license. While Jamerson's convictions are not disputed, whether the facts underlying those convictions warrant a permanent prohibition of her licensure *is* disputed, and requires further factual development. *See* Wis. Stat. § 227.42(1).

¶ 26.   Therefore, we conclude that, because there were issues of material fact, Jamerson was entitled to an administrative hearing regarding the revocation of her group childcare license. Because the trial court and the Division erred in dismissing Jamerson's administra-

tive appeal without a hearing, we reverse those orders, and remand the case to the Division to conduct a hearing not inconsistent with this opinion.

¶ 27.   As a final matter, we note that the parties have raised additional issues on appeal, including whether Jamerson was statutorily entitled to a hearing regardless of whether there were issues of fact to be determined, and whether the Department's dismissal of Jamerson's appeal without a hearing violated her constitutional right to due process of law. Because we have resolved Jamerson's appeal on other grounds, we need not address those matters here. *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) (cases should be decided on narrowest possible ground).

*By the Court.*—Orders reversed.